## Lucy Jacobus

### *v.*

### Alice A. Waits et al.

#### [Decided May 25th, 1916.]

1. Where mother seventy years old, in contemplation of death and while seriously ill and unable to fully comprehend the consequences, deeded to her daughter at the latter's solicitation practically all her property without consideration and without independent advice, the deeds should be canceled for undue influence.

2. While a conveyance from parent to child is not presumptively invalid for undue influence merely because of the relation of the parties, yet, where facts are shown establishing a confidential relation in which the child is the dominant party, a conveyance from the parent to the child is presumed to be tainted with undue influence, and the burden is upon the child to show otherwise.

Heard on bill, answer, replication and proofs.

*Messrs. King & Vogt,* for the complainant.

*Mr. Joseph A. Connolly* and *Mr. Michael J. Tansey,* for the defendants.

FOSTER, V. C.

This action is brought to set aside two deeds of conveyance made by the complainant to her daughter, the defendant Alice A. Waits, under the following circumstances:

The complainant, seventy years of age, is the widow of John W. Jacobus, who died about 1900, and is the mother of five children, including her married daughter, the defendant Mrs. Waits. She lived alone in a small house which she owned at Rockaway, New Jersey, which was worth about $1,500, and, in addition to this property, she owned, at the time the deeds in question were executed, certain mineral rights in property situate near her home, of very little value, and producing no income; and she had on deposit in bank about $200. She also owned property in Newark, which she subsequently sold, the equity of which was worth about $500. This was her entire estate and she lived on the rent she received from rooms which she leased in her house.

Complainant was frequently ill from attacks of indigestion and liver trouble, and in June, 1913, being seriously ill, she sent for her daughter, who lived at Belleville, near Newark, as she thought she was going to die. On the day following the daughter's arrival, Mr. Bolitho, an attorney practicing at Rockaway, who had done some work for complainant, was called to complainant's home and was given instructions by complainant and her daughter to draw a deed conveying from Mrs. Jacobus to Mrs. Waits the house and lot at Rockaway, the consideration stated in the deed being "one dollar and other valuable considerations;" no consideration was in fact paid. Mr. Bolitho, having prepared the deed, returned to complainant's home and informed her of the contents of the paper; she then executed and acknowledged it before him, the daughter being present at its execution. The deed bears date June 20th, 1913.

On the following day, June 21st, Mr. Bolitho prepared and complainant executed before him another deed, conveying to her daughter, for the same consideration, all the mineral rights above mentioned. These deeds were recorded on June 23d, 1913, at the request of the daughter who paid for having them drawn and recorded.

Complainant, whose memory is very poor, claims her daughter, without her request, notified the attorney to call at complainant's home to prepare the deeds; that the daughter, as she testifies, "harassed me to death to get hold of that place ever since I had it;" that her daughter said on the day the first deed was signed, "that she wasn't going to have them drunken brothers of hers have anything, she was going to have it herself." Complainant was very sick in bed at the time and says she did not know that her daughter had gone to Mr. Bolitho's office until she told her he was coming that afternoon. Complainant told her daughter she did not know what she was going to do, and defendant said:

" 'Well, you don't know nothing yourself; I have to fix this thing for myself, and I don't mean my drunken brothers to have anything;' that she was the only decent young one I had, and all such talk."

Nothing was said that she can recall making any provision for her support. Complainant adds: "I signed it (the deed), but I did not understand it—I did not understand it that she made any provision for me whatever." She did not think of the matter until three or four days after the deeds were signed, and has worried ever since, and that she had put up with what her daughter said because she was sick. On her recovery she continued to exercise ownership over the properties; she rented out some rooms and tried to sell the mineral rights. Some weeks after the deeds were executed, complainant consulted Mr. Bolitho about regaining title to the properties.

Mrs. Waits' version of the matter is that her mother being very ill sent for her, and the morning after her arrival complainant directed her to get the lawyer, whom she did not know, and that her mother gave her the directions to find his office, and that when the attorney arrived, complainant gave him the old deeds and the instructions about preparing the new ones; that before going to the lawyer's office defendant said to the complainant:

"Now, Ma, you have been promising and telling me so long that you did not intend for the boys to take away from me what you had willed to me; you have always told me the Rockaway house would be mine; now, if you intend to deed it to me, why don't you do it before you die in one of these sick spells,"

and complainant told her to unlock the trunk and get out the deeds for the Rockaway house, to have the lawyer fix the deed and she would sign it. Defendant adds, that when Mr. Bolitho called he asked the complainant if she had made any provision about her mineral rights, and, when she said she had not, he asked, "If something should happen to you (she had said she thought she was going to die), who would you want to have it?" and complainant replied, "My daughter; I don't want my drunken boys to have a dollar that I ever saved;" and the lawyer then asked her why she did not deed the mineral rights to her daughter, since she was deeding the other property to her, and she said she would, and sent Mrs. Waits, the next morning, to the attorney to have him prepare the deed for the mineral rights and bring it to her by two o'clock so she could sign it before Mrs. Waits left for her home on the three o'clock train; that the deeds were both signed and complainant was up and fully dressed and knew what she was doing, because they talked it over, and she said to complainant, "Ma, for what you have given me, I will always look after you and do what is right for you." After complainant signed the deeds she told the lawyer she would like to dispose of the mineral rights as she expected the money she would receive from the sale to care for her if she lived, and, if she did not, the property was to go to Mrs. Waits.

Mr. Bolitho's version of what happened is that he found a note at his office requesting him to call at the home of Mrs. Jacobus; he did so, and found her very sick in bed. Mrs. Waits let him in and told him her mother wanted to make a deed of the property to her, and she did most of the talking. He prepared the deed and read it to complainant, and, after its execution, gave it to Mrs. Jacobus, who handed it to her daughter. The following day Mrs. Waits called at his office and requested him to prepare a deed conveying the mineral rights to her, which he did, and complainant signed it. Complainant was very feeble and the purport of the conversation between her and her daughter was that she was going to die and that Mrs. Waits was going to look after her and take care of her while sick and see that she was properly buried, and he understood that was the reason for the transfer of the property. Mrs. Waits paid

him for his services, and he thought the expression "good and valuable considerations" in the deed would cover the arrangement between them, whatever it was.    He understood Mrs. Waits was to care for her mother while sick, but was not to provide for her burial, as he does not think he knew of this feature when preparing the deeds.    When he told complainant, on the execution of the second deed, that she was practically transferring all her property to her daughter, complainant said, "It don't make any difference, I don't expect to live over a day or so at the most."    And his "idea of the transaction was that the complainant intended only that the deeds should take effect in case of her immediate death;" that was his understanding on the delivery of the deeds.    He did not think it necessary to put their agreement in the deeds, as he never expected to see complainant alive again; he "thought the old lady was going to die, and what was to be done had to be done quickly."    And although he knew that she was transferring all her property to her daughter, and asked her if that was her intention, to which she replied, "I won't want it any more; and I won't get out of here," or words to that effect, and although he knew when he recorded the deed the title would be vested in Mrs. Waits, he gave the complainant no advice about the matter.

Some time in the following November complainant desired to sell the mineral rights and told Mrs. Waits to sell them for her; and about December 22d she called on her daughter about the matter and asked the price these rights were to be sold for, and then the following conversation took place between them. Complainant asked her daughter, "What will you do if you sell it; are you going to keep the money or are you going to give it to me?" to which Mrs. Waits replied:

"Well, I think I can make a much better sale of the property than you could, therefore I think the money should be put in the bank, in your name and mine, you to have your living from it as long as you live, and when you are gone it is to come to me,"

and complainant said, "Very well."    Mrs. Waits adds, that nothing was said in the conversation about the cottage; the house was to be hers when complainant was through with it; "I

was never to touch it while she lived." This statement was made at the time of the execution of the deeds, complainant was either to live in the house or rent it as long as she lived. Since the deeds were signed, Mrs. Waits states she has done all complainant's sewing and provided her with about all the clothing she has had.

Some time previous to the execution of the deeds, complainant testifies defendant said to her, "I am going to have you make a will," and she took complainant to a lawyer's office in the Prudential building, in Newark, and left her in one room while she talked with the lawyer in another. A will was prepared and executed, giving the daughter all complainant's property except $5, which she gave to each of her sons, because Mrs. Waits told her she must leave the boys something. The will was left with the lawyer, and, later, complainant obtained possession of it and burned it.

The agreement to care for complainant and to bury her, which defendant says she made, was not made until after the deeds were executed and delivered and was without consideration; and it has in no way been substantially performed; aside from some sewing and some articles of clothing, defendant has done nothing for her mother in carrying out this agreement and she has allowed the taxes on the property to remain unpaid.

I think it is clear that these deeds of conveyance were mere voluntary gifts, made without consideration, and, in contemplation of the grantor's impending death, and are within the rule stated in *Slack* v. *Rees, 66 N. J. Eq. 447; Post* v. *Hagen, 71 N. J. Eq. 235,* and approved in *Soper* v. *Cisco, 85 N. J. Eq. 165,* "that undue influence is not to be presumed from the mere relation of parent and child, in case of a conveyance from a parent to a child, and that this does not conflict with the broad rule that, where parties stand in confidential relation to each other, a conveyance from the weaker to the dominant party is presumed to result from undue influence, and, therefore, where facts are shown, other than the mere relation of parent and child, establishing between the parties a confidential relation in which the child is the dominant party, a conveyance from the parent to the child is presumed to be tainted with undue influ-

ence, and the burden is upon the child to show the *bona fides* of the transaction." *Soper* v. *Sisco, supra.*

The facts established justify the application of this rule in the present case and casts upon the defendant Mrs. Waits the burden of showing that these conveyances were not the product of undue influence exercised by her on the complainant.

And where, as in this case, it is apparent that the gift was made to accomplish the purpose of a will, without the safeguards surrounding the execution of a will, an additional reason is presented why the donee should clearly and convincingly show its validity. *Haydock* v. *Haydock, 34 N. J. Eq. 570.*

I do not think defendant has borne this burden, because her own evidence, and that of the scrivener, discloses that it was in part, if not entirely, due to her solicitations that these conveyances were made, and that they were voluntary gifts made in contemplation of the donor's death, without consideration, and to take effect after the death of the donor. Furthermore, the facts show that complainant, in making these conveyances, disposed of practically all her property, without the benefit of proper independent advice. Because of the absence of such advice, and the voluntary nature of the gifts, by which improvident action complainant parted with her entire means of support, and the fact that by reason of her serious illness she was not in condition to fully comprehend, and did not comprehend, the consequences to herself of her act in making these gifts, these conveyances should be set aside.

This conclusion is only giving effect to what the defendant says was the understanding with complainant when the deeds were executed, that the deeds were to become effective only in the event of the death of her mother from illness with which she was prostrated when the deeds were made.

Decree will be advised that the deeds should be set aside and surrendered to complainant, and that the defendants reconvey to her the cottage property and mineral rights.